We'll move to the final case of the day, case number 18-2256, U.S. v. Stoen, and we'll begin with Ms. Brody. Good morning, Your Honors. May it please the Court, my name is Rebecca Brody, and I represent Defendant Appellant Matthew Stoen. Appellant raises one issue on appeal, whether the District Court applied an acceptable method of calculating the loss. Here, the District Court improperly interpreted the limitation against crediting money returned in furtherance of the fraud, and arbitrarily excluded the loan payments and the 17-acre mortgage payments from its credits to Mr. Stoen's loss. The District Court's misapprehension of the guideline was stated on Day 1 of the hearing, in stating, You don't want to reward the defendant for the fraud by letting him set off amounts that he was able to garner from outside sources to make up for the money he had stolen from the company. The inquiry is not whether the defendant obtained funds from outside sources. It is whether the funds were returned to further more fraud. Thus, the loss that anchored the sentence was incorrect, and the sentence should be vacated and remanded for resentencing and recalculation of the restitution. So you, I want to pause you on that last statement there. So you are challenging the restitution and the loss amount, right? Yes, Your Honor. When you started your argument, you said there's one and only one issue, and it involves loss. So we've argued that the restitution is just collateral to the amendment of the loss? The District Court held, and the government has argued, that the two loans obtained by Mr. Stoen are ineligible for credit because they were obtained and paid into the company in furtherance of the fraud. The rule is inapplicable here. In U.S. v. Bolin, relied upon by both the District Court and the government, the court held that there's no credit for money returned in, quote, facilitating a continuing fraud. In that case, the defendant admitted that her purpose in repaying money was to enable her to keep stealing, which she did for three more years. The opposite is the case here. Mr. Stoen used the first loan to purchase new property, something he would not have needed to do to keep stealing. And the December 2008 loan was followed by over one year of Mr. Stoen paying money back into the company, not years of theft. The record shows that beginning in early 2009, Mr. Stoen was making huge deposits of cash back into Stoen Rose. $70,000, $54,000, $16,000, $27,000. It appears that at least with respect to the December 2008 loan, it was followed by a lengthy attempt to repay the funds he had misappropriated. The government's reliance on Lane and Alfonso is similarly misplaced. Both of those cases refer to Ponzi scheme-type fraud, where money is returned to victims in attempts to obtain additional investments, either from new investors or from repeat investors. Mr. Stoen did not use either loan to obtain any new money. The one case that bears similarity here is Brownell, and this case supports awarding the offset for the loans. In Brownell, Judge Wood held that the defendant would be entitled to credit for a line of credit that was fraudulently obtained as long as it was repaid prior to the detection of the fraud. It's important to note that the judge here was confused by the transactions. The court stated, if the government had a better timeline about he took a million dollars or whatever, took out $500,000, I would have had a better grip on exactly what happened. She stated, another frustration I had in reaching my decision is the lack of information. She stated, so I'm a little bit in the dark about all of that. And what's the timing of those statements, Judge Lefkoe's making those? So Judge Lefkoe made these statements on both day one and day two of the hearing. Of the sentencing hearing? Of the sentencing hearing, yes. It appears that the court's holding is a direct result of the district judge's confusion. I note that the court reached the right holding as to two of the requested offsets, but then applied an illogical and inconsistent inference as to the loans. The judge inferred that because the loans were paid into the company during the time of the offense, that they were necessarily in furtherance of the fraud. This reasoning would lead to the absurd result whereby any funds deposited into Stone Rose during the time of the offense would be in furtherance of the fraud, just because of the timing. This is inconsistent with the district court's own holding in granting an offset to Mr. Stone for the management fees and for certain funds that were transferred from his wife's bank account. As to the mortgage payments, it appears that the district court was similarly confused about the transaction and, again, arbitrarily declined to grant the offset. In the first day of the sentencing hearing, the judge was prepared to grant the set-off for the mortgage payments. She stated, I'll give you the set-off on this because it is not clear to me that I mean that Stone Rose, the company, was a victim of this particular transaction. We've argued that Mr. Perry's declaration supports the contention that the mortgage payments were paid because of his relationship with Mr. Stone and because of his awareness of Mr. Stone's commitment to the Stone Rose property, to the 17-acre property. The government argues that the transaction was a sham and that the promissory note was some sort of last-ditch effort by Mr. Stone to hide the fraud. First, the transaction was not a sham, and that property today, or as of the sentencing, holds a $5 million value to the investors. And second, there was a lot of emphasis placed on the date of the promissory note. But the promissory note doesn't simply represent Mr. Perry's payments of the Stone Rose mortgage payments. It actually represents a transfer of ownership beyond what Mr. Perry had initially held in the 17-acre property. And it represents Mr. Stone getting a larger part of interest in that 17-acre property for the Stone Rose investors. You're about at your rebuttal time. Would you like to reserve the remainder? I would, Your Honor. Very good. Thank you. Thank you, Your Honor. We'll next hear from Ms. Young. May it please the Court. It is the defendant's burden to show that the loss amount should be offset by payments or property allegedly returned to the victims. And the district court in this case appropriately found that the defendant had not met his burden to do so. First, with respect to the two loans, the district court concluded that no offsets would be allowed because those loans served to facilitate his ongoing fraud against the investors of the partnership. He injected those funds into the company in order to replace money that he had taken and to make it appear that the company was continuing to operate normally and, in fact, prospering. He used the $500,000 loan in May of 2007 to purchase a property or apply towards a down payment of a property, the 17-acre property that was later sold to the entity owned by the defendant and Mr. Perry, and then used the $350,000 loan in December of 2008 to make an interest payment on a bank loan that was due in owing. The purchase of new property at a time when the company was clearly short of cash gave investors the appearance that the company was not simply solvent, but that it was growing and expanding, despite the economic slowdown that was beginning at that time, as defendants have noted in their brief. Even more so, the payment of the interest, the use of the $350,000 loan to pay interest in December of 2008 certainly facilitated the fraud. A default on a loan would have absolutely notified investors of what was going on, particularly when you consider that at that same very moment in time, the defendant was sending false financials to those investors, indicating that the company was flush with cash. A default right smack dab at that same time certainly would have revealed the fraud. Those loans facilitated the fraud. Now, counsel suggests the court was confused and its ruling was inconsistent, but the fact is that we did not seek to dispute the offset with respect to every payment that was made back to the company. We focused on the ones that facilitated the fraud, and the court appropriately found that was the case. I will note, though, that even if the court had been inclined to find that those loans did offset the losses to the investors who were victims, the overall loss amount would not have changed in this case. I say that because the victims in this scheme also included the lenders. The defendant attained those loans fraudulently in this case. There was no dispute about that. The court so found, and the defendant never disputed that. And those lenders were identified as victims of this scheme in the indictment, and the loans were charged as action furtherance of the scheme. And the scheme as described in the pre-sentence investigation report encompassed the lenders as the victims in addition to the investors, and specifically identified the representations made to those lenders as false statements made as part of the scheme. So that being the case, the loss amount would be the same because the amount that would offset the losses to the investors was suffered by the lenders who were victims. At best, what the defendant was doing here was offsetting the losses to one victim by incurring losses to other victims. The court appropriately found there should be no offset for those loans. Secondly, with respect to the mortgage payments made by Stephen Perry in connection with the mortgage on the 17-acre property, those payments were made by Mr. Perry because he had an interest in the entity that owned that property. He did not make those payments on the behalf of the defendant. He did not make those payments on behalf of the investors of Stone Rose. He stated that he believed when he was making those payments, he was increasing the equity or the interest of himself in the entity that owned the property. In other words, he was protecting his interest in the property, and he was increasing his interest in the property. The defendant never made a single mortgage payment in connection with that property. He never paid Mr. Perry anything in return for the payments he made. Instead, what he did is in September of 2010, he gave Mr. Perry a promissory note for $900,000, a promissory note that Mr. Perry described as, and the agreement described as, essentially buying back the Stone Rose's interest in that entity. Mr. Perry wasn't making those payments on behalf of the investors. If he was, there would have been no need for the defendant to buy back that interest. Of course, the promissory note made no specific promises of when payments would occur, as neither the investors nor Mr. Stone, the defendant, had any money at that time. Mr. Young, was the underlying mortgage liability a liability held by the partnership? The underlying mortgage liability was to Big House Investments. So the property was sold from the partnership to Big House, which was an entity that was created by the defendant and Mr. Perry 50-50. Now, Mr. Perry explained in his interviews with the FBI that were attached to the sentencing memorandum of the government that it was his understanding that the property had to be, or the entity, had to be in the name of the defendant originally, as opposed to Stone Rose, because the bank would not allow a sale that involved basically Stone Rose on both the buyer's side and the seller's side. In other words, you can't sell something to yourself, and the bank wasn't willing to do a refinancing. At a later point in time, the defendant basically transferred his personal interest in the entity back to Stone Rose. It was at that point, according to Mr. Perry, that he began making the mortgage payments. So at the time that the mortgage payments were being made, the mortgage was held by Big House. The entity was controlled by, or at least owned by nominally, Mr. Perry and the investors of Stone Rose. Okay, so I've got a question then about is there any distinction to be made here between what's appropriate for purposes of calculating the loss amount for the guidelines and the restitution amount? And here's what I'm getting at, okay? The proceeds of the loan, okay, I totally understand your argument on the loss part of it, but the proceeds of the loan, did they not went to Stone Rose? And you see where I'm going with this? In terms of is it possible that we have a case here where you may be right on loss amount, but for purposes of what's owed on restitution, given that the partnership itself, Stone Rose and its investors, would have been the beneficiary of, I know conduct that you say is in furtherance of a criminal scheme, but that should lessen the amount owed on restitution. That's the question I have. Right, and certainly the commentary that talks about the return of property is a guideline provision, not a restitution provision. But I would note here that it would not affect the overall amount in this case because of the lender losses. So in other words, even to the extent the court were to give an offset with respect to the loans, there were still losses incurred by the lenders that were not considered as part of the loss amount. In retrospect, they should have been, but they were not. What that means as we stand here is if you were to provide a offset on the guideline provision, the loss would be the same, and the restitution amount ordered by the court would still be consistent with that ruling. With respect to going back to the promissory note, the court ultimately found, without deciding whether or not a promissory note is consistent with the return of money, ultimately found that it had come too late because by September of 2010, the defendant knew or should have known that the investors were on to his fraud. That was supported in the record by the fact that an accounting action had been filed in circuit court by the investors that very summer and the fact that investors had been asking questions. And even as the government notes in its brief, that summer one of the investors had flown out to California to question the defendant and his wife about amounts of money that they were spending. With that, if there are no further questions from the court, the government would request that the court affirm the sentence in this case. Thank you. Thank you, Mr. Young. We'll now turn for rebuttal to Ms. Brody. Thank you. Okay. As to the loans, I think we've argued that they were not obtained to facilitate ongoing fraud. The government's argument would lead to the result where any payment that's paid back into the company during the course of the fraud would necessarily perpetuate the fraud. And that's not the case. That's not what the law is. With regard to the government's statement that the loss wouldn't change, the amounts loaned by those lenders were not included in the loss figure. If they should have been included in the loss figure, okay. But it doesn't change that Mr. Stone should receive a set-off for those amounts. And I note that the circumstances surrounding those loan payments are a little murky. There's no fraudulent document. There's really no documents at all. So I don't know why the government did not introduce more about those to the district court. And with regard to the restitution, the government did state at the district court level that the loss amount for guideline purposes would be the loss amount for restitution purposes. And that's the position that the judge adopted. And here the loss amount for guideline purposes does represent the loss to the victims, the loss to the Stone-Rose partnership. So a change to that loss, a set-off to that loss, would also result in a change to the restitution. And your position is not the other way around. In other words, what I think you're saying is that if we win on the loss amount argument, we're going to win on the restitution. But what if you lose on the loss amount argument? Can you still win on restitution? Well, potentially, if Your Honor is so inclined to include the $5 million value of the Stone-Rose property in calculating the restitution. Thank you, Ms. Brody. Thank you, Mr. Young. The case will be taken under advisement. And the court will...